## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, William Hughes, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I am employed by the United States Food and Drug Administration, Office of Criminal Investigations (FDA-OCI), and have served as an FDA-OCI Special Agent for the past seven years. I am assigned to the Boston Resident Office, whose geographic jurisdiction includes the District of Vermont. I am responsible for investigating violations of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.,* and other federal statutes enforced by FDA, and am authorized to conduct investigations, make arrests, and execute search and arrest warrants for these offenses. I was previously a Special Agent with the Criminal Investigation Command, United States Army, for over eleven years. I have received training in criminal investigative techniques throughout my law enforcement career, and have completed courses including the FDA-OCI Special Agent Training Program at the Federal Law Enforcement Training Center and the United States Army Criminal Investigations Special Agent Training Course. I graduated from Campbell University in North Carolina with a degree in Criminal Justice.

2.       The facts in this affidavit are based upon my personal observations, my training and experience, and information obtained from law enforcement personnel and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

1

3.     As set forth below, there is probable cause to believe that evidence, fruits, or instrumentalities of the following criminal offenses, as described more fully in Attachment B, will be found at the residence and accessory structures comprising 1426 Pudding Hill Road, Lyndonville, Vermont 05851 (the "SUBJECT PREMISES"), as described more fully in Attachment A: introduction of misbranded or adulterated animal drugs into interstate commerce, in violation of 21 U.S.C. § 331(a); and the receipt of misbranded or adulterated animal drugs in interstate commerce and the delivery or proffered delivery of misbranded or adulterated animal drugs into interstate commerce, in violation of 21 U.S.C. § 331(c).

## LEGAL BACKGROUND

4.     The United States Food and Drug Administration ("FDA") is a federal agency responsible for protecting the health and safety of the American public by enforcing the Food, Drug, and Cosmetic Act (the "FDCA"). One purpose of the FDCA is to ensure that drugs sold for use in animals are safe and effective, and bear labeling with only truthful and non-misleading information.

5.     Under the FDCA, drugs are defined as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, 21 U.S.C. § 321(g)(1)(B); articles intended to affect the structure or function of the body of man or other animals, 21 U.S.C. § 321(g)(l)(C); and articles intended for use as components of other drugs, 21 U.S.C. § 321(g)(l)(D). The FDCA further defines a "new animal drug" to include any drug intended for use in animals the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the drug's labeling. 21 U.S.C. § 321(v)(1).

2

6.    Under the FDCA, a new animal drug is considered unsafe unless the FDA has approved a new animal drug application for that drug and both the drug and its labeling conform to the approved application. 21 U.S.C. §§ 360b(a). An unsafe new animal drug is deemed to be "adulterated." 21 U.S.C. § 351(a)(5).

7.    A "prescription animal drug" includes a drug intended for use in animals that "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary for its use, is not safe for animal use except under the professional supervision of a licensed veterinarian." 21 U.S.C. § 353(f)(1)(A). Under the FDCA, a prescription animal drug may only be dispensed by or upon the lawful written or oral order of a licensed veterinarian in the course of the veterinarian's professional practice. 21 U.S.C. § 353(f)(1)(A). The act of dispensing an animal drug without the prescription of a licensed veterinarian results in the drug being "misbranded." 21 U.S.C. § 353(f)(1)(C).

8.    It is a prohibited criminal act under the FDCA to introduce into interstate commerce an adulterated or misbranded drug, or to receive in interstate commerce an adulterated or misbranded drug and then deliver, or proffer delivery of, the misbranded or adulterated drug to others. 21 U.S.C. §§ 331(a), 331(c), and 333(a). A violation of 21 U.S.C. § 331 is a misdemeanor punishable by not more than one year of imprisonment or a fine as provided under 18 U.S.C. § 3571, or both. *See also United States v. Ballistrea*, 101 F.3d 827, 835-36 (2d Cir. 1996) (noting that FDCA violations are strict liability offenses). Such violations committed with the intent to defraud or mislead, or by a person who has previously been convicted under section 331, is a felony punishable by not more than three years of imprisonment or a fine as provided under 18 U.S.C. § 3571, or both. *See* 21 U.S.C. § 333(a).

## PROBABLE CAUSE

9.       Since in or about January 2020, I have been investigating Kenneth and Lisa

Wheeler, residents of the SUBJECT PREMISES, for acting as drop shippers of adulterated and

misbranded animal drugs.  There is probable cause to believe that the Wheelers are receiving and

shipping animal drugs on behalf of the Petbucket.com network, which dispenses unapproved

versions of prescription animal drugs without valid prescriptions.  There is also probable cause to

believe that the Wheelers are receiving and shipping animal drugs on behalf of Bestflea.com,

another seller of unapproved prescription animal drugs without prescriptions that appears to be

unrelated to the Petbucket.com network.

10.      Based on my review of law enforcement reports, conversations with other law

enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A. Petbucket.com

11.      On January 28, 2020, the Brand Safety and Security Division of Boehringer

Ingelheim reported to FDA-OCI that the website Petbucket.com was selling and shipping

foreign, unapproved prescription animal drugs to customers within the continental United States.

Boehringer Ingelheim reported that Petbucket.com is based in the United Kingdom.  Boehringer

Ingelheim's Brand Safety and Security Division successfully made a test purchase of NexGard

from Petbucket.com in January, 2020. NexGard is an FDA-approved prescription animal drug

for the treatment and prevention or control of flea and tick infestations and the prevention of

Lyme disease in canines.  The test purchase was completed without a prescription and, upon

receipt of the package, it was noted the return address was Post Office (PO) Box 43,

Lyndonville, VT 05851.

12.     On February 11, 2020, the Product Integrity Division, Merck & Company, provided information to FDA-OCI concerning its contact with Petbucket.com. Merck's Product Integrity Division made three successful test purchases of Bravecto Chews from Petbucket.com without a prescription in August, 2018 and July, 2019. Bravecto Chews, a Merck product, is an FDA-approved prescription animal drug for the treatment and prevention of flea and tick infestations in canines. Merck sent Petbucket.com three "cease and desist" letters requesting that the company remove Bravecto Chews from its website. In June, 2019, following receipt of the second cease and desist letter, Petbucket.com responded to Merck, via email, that it did not ship to the United States and that its payment processor prevents customers from making purchases with U.S. credit cards. Merck reported that Petbucket.com also added a note on its website, "This item is not shipped to the USA," referring to Bravecto Chews. However, Merck made a third successful test purchase after Petbucket.com made the statements to Merck and after Petbucket.com noted on its website that it did not ship Bravecto Chews to the United States.

13.     Between March 4, 2020, and March 20, 2020, I received Information Request Reports (IRR) from LegitScript concerning a request for information on the Petbucket.com and Bestflea.com websites. LegitScript is an organization specializing in Internet pharmacy verification, customized platform sweeps, threat assessments, investigative reports, and online pharmacy certification approval by the U.S. National Association of Boards of Pharmacy. FDA-OCI has a contract with LegitScript for assistance with Internet-focused investigations.

14.     According to the LegitScript reports, Petbucket.com and more than a dozen affiliated websites operated by Pet Bucket sell prescription animal drugs in various jurisdictions, including the United States, without requiring valid prescriptions. The animal drugs are sourced from a worldwide supply chain and shipped to U.S. customers from the United Kingdom and

Singapore. Pet Bucket, LTD is registered in the United Kingdom. The company's office address is The Business and Technology Centre, Bessemer Drive, Stevenage SG1 2DX. Yunus Emre Atalan, the company's sole director, resides at 21 Pickford Road, St. Albans, Hertfordshire AL3 8RS, the former address for the company until January 2019. As of February 2020, the Pet Bucket network consisted of 18 active websites, 11 of which market or facilitate the sale of prescription animal drugs.

15.     On April 24, 2020, I navigated to the Petbucket.com website and created an undercover account. The website appeared to me to sell prescription dog and cat drugs. Under the "contact us" tab on the website, I observed the phone number 800-908-4010 and the email address support@petbucket.com. Later this same day, after I submitted an account creation request, an email from support@petbucket.com was received welcoming my undercover identity to the website.

16.     Also on April 24, 2020, using the undercover account I had created, I navigated to the website Petbucket.com and completed an undercover purchase of Bravecto Chews for Dogs (9-22lbs) for $34.95, Heartgard Plus for Dogs, (26-50lbs) for $60.95, and Previcox for Dogs (227mg, 60 Tablets) for $68.95. Heartgard is a prescription animal drug approved by the FDA for the prevention of heartworm disease in dogs. Previcox is a prescription animal drug approved by the FDA for osteoarthritis pain relief in dogs. A prescription was not required or requested during the purchase. I received an email from support@petbucket.com the same day stating that my undercover identity had earned 3,300 Reward Points. Later that same day, I received another email from support@petbucket.com that confirmed and summarized the order and included the confirmation number 1006395.

17.     On April 26, 2020, I received an email from support@petbucket.com, stating that the order was on the way.  Items listed as shipped were Heartgard Plus and Bravecto Chews.

18.     On April 27, 2020, I received an email from "Nitza" from the email address petbkr@naver.com.  The email was written in Chinese and English and stated that Previcox for Dogs was out of stock and my money would be refunded.

19.     On May 1, 2020, I responded to "Nitza" at email address petbkr@naver.com and asked when Previcox for Dogs would be back in stock. I received no response.

20.     On May 26, 2020, I received a package via the U.S. Postal Service (USPS) containing two boxes of Heartgard Plus and one box of Bravecto Chews.  The package was from the Petbucket.com undercover purchase on April 24, 2020. The package had a return address of S'Pore Post Center, PO Box 1050 S914035, Singapore.

21.     On May 26, 2020, I coordinated with the Brand Safety and Security Division, Boehringer Ingelheim, the manufacturer of Heartgard Plus. Photographs of the drugs purchased were provided to the Brand Safety and Security Division who confirmed the Heartgard Plus drug was authentic and authorized for sale within the United States.

22.     Also on May 26, 2020, I provided photographs of the drugs purchased to the Global Security Group, Product Integrity Division, Merck & Co., Inc., the manufacturer of Bravecto Chews. Merck confirmed that the Bravecto drug was manufactured in Austria, intended for distribution in South Africa, and not authorized for sale in the United States.

23.     On May 29, 2020, I received copies of the undercover credit card statements for the purchase from Petbucket.com.  The PetBucket.com purchase was listed on the statement as PTB International Limited, Hong Kong.

7

24.     On June 12, 2020, I provided details of the undercover purchases from the target

websites and photographs of the drugs purchased to a Veterinary Medical Officer in FDA's

Center for Veterinary Medicine. She concluded that the version of Bravecto Chews I received

from my Petbucket.com order is not approved by the FDA for distribution in the United States.

B. Bestflea.com

25.     On February 7, 2020, an open source Internet search via the Google search engine

for Post Office Box 43, Lyndonville, Vermont (the return address on the Boehringer Ingelheim

test purchase from Petbucket.com, noted above) identified a second website, Bestflea.com.  The

Lyndonville address was listed on the website's "contact us" page. This website sells animal

drugs similar to those sold via Petbucket.com and offers shipping to U.S. customers.  According

to information provided by LegitScript, drugs marketed on Bestflea.com appear to include

foreign, unapproved versions of U.S. prescription drugs.  Bestflea.com is based in Conwy,

Wales, in the United Kingdom, and is operated by Richard Rhys Owen and Marian Owen.

26.     On April 16, 2020, I navigated to the website Bestflea.com and created an

undercover account. The website appeared to me to sell prescription dog and cat drugs. Under

the "contact us" tab, I noted the phone number 800-839-1592 and the email address

sales@bestflea.com.

27.     On April 22, 2020, I navigated to the Bestflea.com website and completed an

undercover purchase of NexGard Chewable for Medium Dogs (10-24lb) for $74.00. A

prescription was not required or asked for during the purchase. That same day I received an

email from sales@bestflea.com which confirmed the purchase and provided the confirmation

number 100009169.

28.     On May 21, 2020, I received a package via USPS containing one box of
NexGard. The package was from the Bestflea.com undercover purchase, conducted on April 22,
2020. The package had a return address of SPM PO Box 43, Lyndonville, VT 05851-0043. The
invoice contained within the package provided the same confirmation number provided at the
time of the purchase.

29.     On May 26, 2020, I provided details of these undercover purchases from the
target websites and photographs of the drugs purchased to the Brand Safety and Security
Division, Boehringer Ingelheim, the manufacture of NexGard.  Boehringer Ingelheim confirmed
the NexGard drug received via the undercover purchase was manufactured for the United
Kingdom market and was not authorized for sale in the United States.

30.     On May 29, 2020, I received copies of the undercover credit card statements for
the Bestflea.com purchase.  The Bestflea.com purchase was listed as Pharma-Group.co.uk.

31.     On June 12, 2020, I provided details of these purchases from the target websites
and photographs of the drugs purchased to a Veterinary Medical Officer in FDA's Center for
Veterinary Medicine.  The Veterinary Medical Officer confirmed that the NexGard I received
from my Bestflea.com order was not approved by the FDA for distribution in the United States.

C.  Kenneth and Lisa Wheeler

32.     On March 23, 2020, the United States Postal Inspector's Office provided PO Box
application records concerning PO Box 43, Lyndonville, Vermont.  The box was rented to
Kenneth and Lisa Wheeler of 1426 Pudding Hill Road, Lyndonville, VT 05851 (i.e., the
SUBJECT PREMISES) in May 2018 according to these records. In addition to the Pudding Hill
Road address, the phone number 802-626-8804 was listed on the application document.  I
searched for information concerning that phone number in the databases LexisNexis and

Accurint, and learned that the number was associated with both Kenneth and Lisa Wheeler. LexisNexis Accurint for law enforcement is a company specializing in the expedited identification of people and their assets, addresses, relatives and business associates. It uses databases of public records to assist law enforcement agencies to search, access, link, process and analyze the information they require, such as names, addresses, emails, death and criminal records, phone numbers, and real property records.

33.     According to records provided by the USPS, 535 parcels had been sent to PO Box 43 in the previous two years. Approximately 334 of those parcels were international parcels.

34.     An FDA criminal analyst searched the LexisNexis and Accurint databases for information concerning Lisa and Kenneth Wheeler, and reported that those searches indicated that Lisa and Kenneth Wheeler lived at 1426 Pudding Hill Road, Lyndonville, VT 05851.

35.     On March 24, 2020, U.S. Postal Inspector Kristin Miller and I coordinated with the Postmaster for the Lyndonville, Vermont Post Office concerning this investigation.  The Postmaster stated that Kenneth Wheeler came to the post office on average five or six days a week to pick up and drop off packages. The Postmaster stated that Kenneth Wheeler dropped off between one hundred and two hundred packages each day. The Postmaster further stated that he had spoken to Kenneth Wheeler and that, during those conversations, Mr. Wheeler disclosed to her that the packages were all dog-related products.  According to the Postmaster, Kenneth Wheeler received packages from the United Kingdom on average twice a week.  On this same day, I personally observed six large packages at the post office addressed to the Wheelers' Post Office Box. The packages bore the sender's address "Pharma Pack LTD, P733539, Unit 10 A-B, Conwy Morfa Enterprise Park, Parc Caer Seion, Conwy LL32 8FA, United Kingdom," and the delivery address, "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851." The contents of the

packages were listed as "Pet Products." The packages had been shipped via Express Mail Service (EMS).

36.     On March 24, 2020, I searched Vermont Secretary of State, Business Services Divisions records for businesses registered to or by Kenneth or Lisa Wheeler, and found none.

37.     Also on March 24, 2020, Inspector Miller and I surveilled the SUBJECT PREMISES and the Lyndonville Post Office. Around 3:10 pm, we observed Kenneth Wheeler departing the SUBJECT PREMISES driving a red Dodge Ram pickup truck. The truck was registered to him, according to the Accurint database referenced above. Kenneth Wheeler drove to the Lyndonville Post Office, where he backed into the loading ramp area and unloaded several U.S. Postal Service tubs containing dozens of small packages. Kenneth Wheeler then loaded the six large packages previously described into his truck. Inspector Miller observed Wheeler driving back to his residence after picking up those packages.

38.     Later that day, Inspector Miller and I coordinated with the Postmaster, who led us to the bin containing the packages Kenneth Wheeler had dropped off. There appeared to me to be over one hundred packages in the bin. Addresses on the packages were to multiple states within the continental United States and to locations in Canada. I also observed return addresses on the packages including: "Lisa, 1426 Pudding Hill Road, Lyndonville, VT 05851," "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851" and "SPM, PO Box 43, Lyndonville VT 05851."

39.     On April 27, 2020, Inspector Miller and I again coordinated with the Postmaster, who showed us five large packages that Kenneth Wheeler was expected to pick up that day from the Lyndonville Post Office. The packages were addressed from "Pharma Pack LTD, P733539, Unit 10 A-B, Conwy Morfa Enterprise Park, Parc Caer Seion, Conwy LL32 8FA, United Kingdom," and addressed to "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851." The contents

11

of the packages were listed as "Pet Products." The packages had been shipped via EMS. Later this same day Kenneth Wheeler was observed departing his residence driving the red Dodge Ram truck described above. Mr. Wheeler drove to the Lyndonville Post Office and unloaded several U.S. Postal Service tubs containing small packages. He loaded the five large packages previously described into the truck, then drove straight back to the SUBJECT PREMISES.

40.    Later on April 27, 2020, the Postmaster led Inspector Miller and me to the bin containing the packages Kenneth Wheeler had dropped off. There were 177 packages in the bin. Addresses on the packages included locations in several states within the United States and locations in Canada. Return addresses included "Lisa, 1426 Pudding Hill Road, Lyndonville, VT 05851," "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851" and "SPM, PO Box 43, Lyndonville VT 05851."

41.    On May 4, 2020, Inspector Miller reported eleven international packages were due to arrive at PO Box 43, Lyndonville, VT 05851, on May 5, 2020.

42.    On May 5, 2020, Inspector Miller and I coordinated with Lyndonville Post Office personnel who led us to eleven large packages that Kenneth Wheeler was expected to pick up that day. The packages were addressed from "Pharma Pack LTD, P733539, Unit 10 A-B, Conwy Morfa Enterprise Park, Parc Caer Seion, Conwy LL32 8FA, United Kingdom," and addressed to "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851." The contents of the packages were listed as "Pet Products." The packages had been shipped via EMS. Later that day, Inspector Miller saw Kenneth Wheeler departing his residence driving the red Dodge Ram truck described above. Kenneth Wheeler drove straight to the Lyndonville Post Office, where he unloaded several USPS tubs containing small packages. Kenneth Wheeler then loaded the eleven large packages previously described into his truck and drove back to the SUBJECT PREMISES.

43.    Later on May 5, 2020, Inspector Miller and I coordinated with USPS personnel who led us to the bin containing the packages Kenneth Wheeler had dropped off.  There were over two hundred packages in the bin.  Addresses on the packages included locations in several states within the United States and in Canada.  Return addresses included "Lisa, 1426 Pudding Hill Road, Lyndonville, VT 05851," "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851" and "SPM, PO Box 43, Lyndonville VT 05851."

44.    On May 21, 2020, Inspector Miller reported fourteen international packages had arrived at PO Box 43, Lyndonville, VT 05851, between May 16 and May 18, 2020.

45.    On June 25, 2020, Inspector Miller and I observed Kenneth Wheeler departing his residence driving a black Dodge Ram pickup truck with temporary license plates.  Kenneth Wheeler drove straight to the Lyndonville Post Office, where he unloaded several USPS tubs of small packages. Kenneth Wheeler then drove straight back to the SUBJECT PREMISES.

46.    Later on June 25, 2020, Inspector Miller and I coordinated with the Postmaster who led us to the bin containing the packages Kenneth Wheeler had dropped off. There were 212 packages in the bin. Addresses on the packages included locations in several states within the United States and in Canada.  Return addresses on the packages included "SPM, PO Box 43, Lyndonville VT 05851."

47.    On July 23, 2020, Inspector Miller and I again coordinated with the Postmaster, who led us to a bin containing two international packages.  The packages were addressed to "Lisa Wheeler, PO Box 43, Lyndonville, VT 05851," and bore the a return address, "Pharma Pack LTD, Unit 10 A-B, Conwy Morfa Enterprise Park, Parc Caer Seion, Conwy LL32 8FA, United Kingdom."  Shipping documents on the packages stated the packages contained "Pet Products."

13

48.      Also on July 23, 2020, Inspector Miller and I observed Kenneth Wheeler departing his residence driving a black Dodge Ram pickup truck with temporary plates.   Mr. Wheeler drove straight to the Lyndonville Post Office. Upon his arrival, he signed for the two packages referenced above and placed them into his truck. Kenneth Wheeler then unloaded several USPS tubs containing small packages, and drove straight back to the SUBJECT PREMISES.  Inspector Miller and I then coordinated with the Postmaster who led us to the bin containing the packages Kenneth Wheeler had dropped off. There were eighteen packages in the bin. Addresses on the packages included locations in several states within the United States and in Canada.  Return addresses on the packages included "SPM, PO Box 43, Lyndonville VT 05851, "Lisa, 1426 Pudding Hill Road, Lyndonville, VT 05851" and "Lisa@bestflea, PO Box 43, Lyndonville VT 05851."

49.      Based on my training and experience, I know that both legitimate and illicit businesses frequently use computers to carry out, communicate, and store records concerning their operations.  These and related tasks are frequently accomplished through sending and receiving business-related electronic messages, drafting business documents, and accessing banking, financial, and other accounts concerning the movement of funds or inventory.  In particular, based on my training and experience investigating drop shippers associated with online sales of pharmaceuticals, shippers, suppliers, and their customers communicate via text, email, phone, and other forms of electronic communication, including text and voice apps or web-based systems.  Thus, records of the type described in Attachment B are commonly stored in computer hardware, computer software, and electronic storage media.

D. Computers, Electronic Storage, and Forensic Analysis

50.   As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other electronic storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.   I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that

log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the Internet Protocol addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

   c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53.    In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and

completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

E.     <u>Technical Terms</u>

55.     I use the technical terms referenced above and below to convey the following meanings:

a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same state.

c.   Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## CONCLUSION

56.     Based on the information described above, there is probable cause to believe that Kenneth and Lisa Wheeler have introduced misbranded and adulterated animal drugs into interstate commerce, in violation of 21 U.S.C. §§ 331(a), and received misbranded and adulterated animal drugs in interstate commerce and delivered the misbranded and adulterated animal drugs to others, in violation of 21 U.S.C. § 331(c).

57.     Based on the information above, I also have probable cause to believe that evidence of these crimes, as well as contraband, fruits and instrumentalities of these crimes, and other items illegally possessed as described in Attachment B, are contained within the premises described in Attachment A.

Dated at Burlington, in the District of Vermont, this 31st day of July, 2020.

William Hughes
Special Agent, FDA-OCI

Sworn to and subscribed before me this 31st day of July, 2020.

JOHN M. CONROY
United States Magistrate Judge

23